UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------- X
   UNITED STATES OF AMERICA,        :
                                     :
                Plaintiff,   :   **MEMORANDUM**
        - against -         :   **DECISION AND ORDER**
                                     :
   MICHAEL MITSELMAKHER and ALEX   :   07-CR-37 (BMC)
   MITSELMAKHER,                    :
                                     :
            Defendants.   :
------------------------------------------------------- X

**COGAN**, District Judge.

On August 21, 2007, a jury acquitted Michael and Alex Mitselmakher of the three

charges in an indictment returned January 17, 2007: extortionate collection of credit conspiracy

(Count One), extortionate collection of credit (Count Two), and extortionate extension of credit

(Count Three). [1] On October 1, 2007, the Mitselmakhers filed the instant motion, pursuant to the

Hyde Amendment, 18 U.S.C. § 3006A, for an award of attorneys' fees and litigation expenses

totaling $195,678.27.

The Government made two crucial mistakes in bringing this case. First, it credited a

story by a complainant who stood to gain exoneration from a $50,000 gambling debt if the

Government bought his story of extortion. The complainant had no skin in the game; he was

going to get out of his debt whether the jury accepted his testimony or not, and the Government

did not appreciate how transparent the complainant's motivation would appear to the jury.

Second, having bought the story, the Government performed a cursory investigation of the

complainant's background despite indicators that there was more to look at. When defense

counsel obtained publicly available records, they destroyed the credibility of the complainant at

---

[1] Arkady Seifer was charged with all three counts of the indictment as well, but he pled guilty on May 4, 2007 to a
superseding information charging one count of illegal gambling.

trial. He incredibly insisted at trial that prior lies he told under oath were in fact the truth, and even worse, the Government took the view, and still takes the view on this motion, that it was the truth. The result of these errors was a rapid acquittal.

Notwithstanding the inadequacies of the investigation and prosecution, I cannot find entitlement to recovery under the Hyde Amendment. The Hyde Amendment does not sanction poor judgment or myopia. It requires the prosecution of a defendant that is "vexatious, frivolous, or in bad faith." I do not see that on these facts, and accordingly, deny the motion.

## BACKGROUND

### I. Peysakhov's and Belakh's Allegations and the Government's Investigation

#### A. Allegations made by Peysakhov and Belakh

On November 2, 2006, Zakhar Peysakhov and Vyacheslav Belakh came to the FBI with allegations concerning the Mitselmakhers. Peysakhov alleged, and eventually testified at trial, that in mid-October 2006, he lost approximately $50,000 to the Mitselmakhers during a poker game that was part of a weekly high-stakes game operated by the Mitselmakhers at the Brooklyn restaurant they owned named the Rasputin. In the days following the game, after consulting with Belakh, a fellow poker player, Peysakhov met with the Mitselmakhers at the Rasputin, accused them of having cheated, and declined to pay the $50,000. However, the Mitselmakhers refused to release the debt.

A few days later, on October 26, while Peysakhov and Belakh played at a different high-stakes poker game, this one held at a home in Brooklyn, the Mitselmakhers arrived by surprise and physically assaulted Belakh in a side room. Immediately thereafter, Peysakhov and another

2

individual accompanied Belakh to a Manhattan hospital for medical treatment, and en route, Peysakhov and Belakh received numerous calls from the Mitselmakhers, warning Peysakhov and Belakh not to involve the police and seeking a meeting with them later that same night.

Peysakhov did not meet with the Mitselmakhers until the next day at the Rasputin, where Seifer was also present. During the meeting, Alex searched Peysakhov for recording devices and confiscated his phone, and the Mitselmakhers threatened Peysakhov that if he failed to pay the $50,000, they would sell his debt to "reputable people in the community who would get the money out of [him] anyway." On November 2, Peysakhov and Belakh went to the FBI with their allegations.

Belakh's allegations, and later testimony, confirmed Peysakhov's account, including the existence of the regular high-stakes poker game at the Rasputin; Peysakhov's $50,000 loss to the Mitselmakhers; Peysakhov's refusal to pay; the Mitselmakher's desire to collect in the following days; the Mitselmakher's assault of Belakh at a poker game a few days later, necessitating medical treatment; the Mitselmakhers' repeated attempts by phone to arrange a meeting with Peysakhov and Belakh that same night; and Peysakhov's meeting with the Mitselmakhers and Seifer at the Rasputin the next day.

Other evidence obtained by the Government during the investigation is consistent with part of Peysakhov's and Belakh's allegations. Telephone records indicate that on October 26, the date the Mitselmakhers assaulted Belakh, the Mitselmakhers called Belakh's phone three times in under three hours and also called Peysakhov's phone, and that Peysakhov called Alex. Medical records indicate that Belakh did go to the hospital and received eight stitches in his lip the day he was allegedly assaulted by Michael.

3

Belakh also testified that in the days prior to the Mitselmakhers' assault, Michael had threatened to "break his face" because he believed Belakh had advised Peysakhov not to pay the $50,000 debt. As the Mitselmakhers assaulted Belakh, Michael screamed "this is for your running mouth" and again referenced Peysakhov's nonpayment. In a meeting at the Rasputin the day after the assault, Michael re-confronted Belakh regarding his role in Peysakhov's refusal to pay the $50,000 debt.

### B. Recordings and Observations

Based on Peysakhov's and Belakh's allegations, the Government arranged for Peysakhov to cooperate with an investigation of the Mitselmakhers by recording conversations and meetings with them in an effort to gain evidence. Thirty-two recordings, consisting of telephone conversations and meetings, were made during November and December 2006.

*Initial Recordings, November 2-3*

In the first recorded conversation, on the night of November 2, Michael confirmed the deadline the Mitselmakhers had set for Peysakhov to prove they cheated or to pay the debt, and refused to allow Peysakhov to pay less than his full debt. Michael also told Peysakhov that "[i]f you don't pay the money you – you will see what is going to happen. You don't need any explanation about what is happening. Somebody will explain it to you." After Peysakhov expressed worry over problems while walking the street, Michael reassured Peysakhov, "[g]o ahead, walk. Don't worry. What are they going to [do,] kill you for that? Are you crazy?" Michael further reassured Peysakhov, telling him "I have no intention of hurting you, but somehow I need to collect my money." Immediately after that conversation, Michael called Peysakhov back and told him he should ask Belakh whether he needed to pay, because Michael

"spoke to" Belakh and Belakh said he "told you right to your face that you are wrong, that you have to pay."

The next day, Friday, November 3, the Mitselmakhers met face-to-face with Peysakhov at the Rasputin. During that meeting, they insisted that Belakh had nothing to do with Peysakhov and that Peysakhov had nothing to worry about if he paid his debt. These statements are entirely consistent with both the Mitselmakhers' actions and the testimony in this case. However, the Mitselmakhers also explained that if Peysakhov did not pay the entire debt immediately, they would sell it. They made clear that whoever purchased the debt would demand interest, noting that if Peysakhov paid up at that time he would not need to pay a penny more and that "nobody laid a finger on you." They also related that three people already wanted to buy his debt and that Peysakhov "won't like any of the three." The meeting concluded with the Mitselmakhers extending the payment deadline from Friday to Monday, but warning that "on Monday someone will be knocking on your door."

*Recordings One Week Later, November 10*

Four days after the extended deadline had passed, Friday, November 10, the Mitselmakhers had still not been paid. That day, security videos at Peysakhov's workplace, and FBI agents observing from a parked car, captured the Mitselmakhers surprising Peysakhov at work and trying unsuccessfully to coerce him into their car. FBI agents conducting surveillance of the meeting later testified that the Mitselmakhers were angrily speaking to Peysakhov and getting "in his face," and that Michael had grabbed the back of Peysakhov's head and neck. Later that day the Mitselmakhers met with Peysakhov and during the meeting (the second recorded meeting, but the twelfth recorded conversation overall), as in prior conversations, the

5

Mitselmakhers expressed repeated frustration at Peysakhov starting "a war" with them, his "spiteful smile," his refusal to let them settle the dispute in a "normal" way, and similar agitating actions Peysakhov took in an obvious effort to goad the Mitselmakhers into culpable action.

During this meeting, the Mitselmakhers explicitly threatened Peysakhov and promised to sell the debt to those who would collect it through force and at an interest rate of twenty percent per week. Michael forcibly turned Peysakhov's head in the direction of two males seated in a nearby parked vehicle and warned that those two would harm him if he failed to pay. He also searched Peysakhov for recording devices and warned him against contacting the police. Finally, he offered to introduce him to loan-sharks such as Seifer.

On November 15, Peysakhov made a controlled payment of $5,000 to Michael and Seifer and accepted Michael's proposal that Peysakhov finance his payment through Seifer at an annual rate of seventy-two percent, after which Peysakhov made a first payment to Seifer of $2,700, representing a monthly interest payment on the remaining $45,000. Peysakhov, working with the Government, continued to record his conversations with the Mitselmakhers throughout November and December.[2]

---

[2] On December 15 – more than one month after the explicit threats of November 10 and approximately two months after Peysakhov first incurred the debt – an NYPD sergeant, participating in surveillance of the Mitselmakhers, was recorded, and expressed his frustration at Peysakhov's inability to provoke an assault:

Are these guys going to talk him to death? Give him a beating, break his leg or something.

\*\*\*

If this guy doesn't cut it off soon [,] I'm going to go over there and hit him [.]

\*\*\*

What did you tell this guy, f----n' talk to these guys [f]or as long as you can so you annoy [] the sergeant?

On January 23, 2007, the Mitselmakhers were arrested. Michael admitted at the time of his arrest that he had struck Belakh, had searched Peysakhov for a recording device during one of their meetings to avoid law enforcement scrutiny, and forcibly turned Peysakhov's head toward a parked car containing a bouncer from the Rasputin to instill fear in Peysakhov. The Mitselmakhers were detained until their release to home detention on March 6, 2007.

### C. Other Evidence

During the course of the investigation, the Government also learned that Michael had a prior federal conviction for conspiracy to defraud the United States of fuel excise taxes; confidential sources of the FBI independently had reported criminal activity by the Mitselmakhers, including – as to Michael – extortionate collection of credit; and confidential sources of the FBI had reported that Michael had close ties to at least two high-level figures in Russian organized crime.[3]

## II. The Government's Investigation of Peysakhov and Disclosure of Information

On Friday August 3, 2007, after 6:00 p.m., just ahead of the scheduled start of jury selection on Monday, the Government produced 3500 material, 18 U.S.C. § 3500, which included a non-prosecution cooperation agreement covering Peysakhov for his "participation in criminal activity involving the submission of approximately 35 credit card applications containing inflated income between 1998 and 2006." At the same time, the Government also

---

[3] The Government also has submitted an affidavit from Agent Conrad to the Court *ex parte*, which sets forth additional information from confidential sources about Michael's alleged ties to Russian organized crime. The Mitselmakhers urge the Court to strike it from the record or produce it in redacted form, because of the Government's alleged repeated misrepresentations in this case. If the Court is not inclined to do so, the Mitselmakhers' counsel asks for the chance to cross examine Agent Conrad about what he understands Russian organized crime to mean since it is not a defined term. The Hyde Amendment allows for *ex parte* submissions of evidence by the Government, and the Mitselmakher's counsel provides no authority in support of the request. The request is denied.

produced an FBI report of an interview with Peysakhov during which he stated that he "has exaggerated his income on credit card applications in order to get a higher credit limit."

Defense counsel requested Peysakhov's credit reports, tax returns, and credit card statements, as well as handwritten notes of FBI agents' interviews with Peysakhov. The matter was addressed several times before this Court. The Government opposed the requests arguing that it was not obligated to assist the defense in a lengthy background check of a witness or provide a witness' social security number or birthdate to facilitate defense counsel doing the same. The Court ordered the prosecutor to check with his colleagues again to determine if the Government possessed any credit reports for Peysakhov or further details about his bank fraud.

The next day, August 7 – the day before opening statements – the Government advised defense counsel that Peysakhov "has assisted others in executing insurance fraud. More specifically, Peysakhov has linked 'victims' in staged accidents with doctors who would corroborate supposed injuries sustained during those accidents." On August 8, defense counsel sought an adjournment to allow it to investigate this fraud. The Government said it had first learned of this insurance fraud just a few days before and had delayed disclosure because it had "wanted to do some slight investigation to make sure there is nothing else out there." The Government argued to the Court that its investigation was sufficient and the trial need not be adjourned to allow a defense investigation.

The Court adjourned the trial until the following Monday, August 13, and ordered the Government to interview Peysakhov about the details of his bank fraud and insurance fraud and disclose those details to defense counsel by the following day. The report so provided noted

8

Peysakhov's statement that he had defaulted on several credit cards that he had fraudulently obtained, but that he had paid off the judgments.

After receiving the reports, defense counsel ran Peysakhov's name in Kings County state court and found three civil suits in which Peysakhov was a defendant and, using his social security number which was contained in those reports, found two other lawsuits in which he was named as a defendant. The Brooklyn files indicated that, contrary to his statements to the Government, Peysakhov settled those actions for less than the total amount of debt; one of the other files showed that Peysakhov had participated in a staged accident, something he had never told the Government. These simple steps provided defense counsel with the ammunition to cross-examine Peysakhov and undermine his credibility at trial.

Also at trial, FBI Agent Abrahams testified that the FBI had learned, from a background check on Peysakhov near the start of the Government's investigation, that he had been named as a defendant in lawsuits and knew from Peysakhov himself that defrauded creditors had sued him. Despite this knowledge, and its knowledge that Peysakhov was a frequent gambler, the Government elected not to investigate – beyond a government database search (which found no record of crimes by Peysakhov) – the lawsuits, obtain copies of his credit card statements, or otherwise inquire beyond what Peysakhov told them.

In the Government's opening statement, the prosecutor described Peysakhov as "a compulsive, addictive gambler, [who] carries with him all of the baggage that usually goes with that type of lifestyle, constantly in debt, borrowing money from his family and friends, lying to them about why he needs the money, constantly engaged in little scams to keep himself financially afloat." Yet, after learning of the extent of Peysakhov's fraudulent past at trial, the

prosecutor stated that the Government would have gone forward in any event, and that his sole regret was not thinking to ask for the information and then fronting the issue. As the Government conceded at oral argument on this motion, the background investigation of Peysakhov was "shoddy."

Specifically, even after learning the facts surrounding Peysakhov's defense of the credit card default judgments entered against him, the Government continued to stand behind Peysakhov's assertions and explanations as to why he did not owe the debts. As the Government explained at oral argument on this motion, Peysakhov told them that he did not owe the debts simply because he was never served. Although this legal argument explains why Peysakhov did not respond to the lawsuits, it does not respond to whether Peysakhov actually owed the underlying debts, which he surely did. This evidence was especially damning to Peysakhov's credibility in this case where Peysakhov once again made bald assertions that he did not owe a debt. When questioned as to why the Government did not do more to investigate this issue, the Government simply responded that Peysakhov's explanation was at least "an explanation" and that there was not a "complete abdication of the Government's responsibility to get to the bottom of this."

### III. Additional Government Conduct

The Mitselmakhers chronicle a series of additional Government actions throughout the case that warrant mentioning. First, they point to the extended detention of the Mitselmakhers. At the Mitselmakhers' arraignment, after the Magistrate Judge ordered the Mitselmakhers released on bonds of $7 million each; the prosecutor sought a stay of the order pending appeal despite knowing that the birth of Alex's son was imminent and that the *bris* of Michael's son was

10

scheduled later that day. In opposing bail, the prosecutor represented that the severity of the alleged extortion was established because the Mitselmakhers were recorded on tape threatening "to bring in Russian organized crime to collect debt," when in fact the Mitselmakher's never identified the third parties to whom they suggested they could sell the debt. The Government states, via an affidavit from FBI Special Agent Conrad, that it based this assertion on, among other things: Peysakhov's account that the third parties were "reputable people in the community who would get the money out of [him] anyway;" the FBI squad's experience and training that the expression "reputable people in the community" is a term of art in the Russian immigrant criminal community synonymous with Russian organized crime; and Michael's ties to Russian organized crime. The Mitselmakhers responded by pointing out that these words were never recorded and that, even if they were said, according to an affidavit from a member of the Russian immigrant community, "reputable people in the community" refers to respected members of the community who have traditionally served as unofficial arbitrators in resolving disputes within the community.

Second, the Mitselmakhers refer the Court to what they claim were the Government's improper attempts to limit information so as to avoid facts harmful to the prosecution or beneficial to the defense. They contend that in front of the grand jury, the prosecutor almost completely limited Agent Conrad – apparently the only law enforcement officer to testify in the grand jury – to reading aloud from his previously-written reports of his debriefings of Peysakhov, rather than engaging Agent Conrad in questions and answers or having him read from transcripts of the recorded conversations themselves. This, allegedly, was intended to maintain the Government's spin on the evidence and prevent any departure therefrom. The

11

Mitselmakhers further complain that the Government's interview reports reflect no record of Peysakhov answering questions concerning any of his prior crimes. They contend that no report exists to resolve the conflict between Peysakhov's recollection that he filed tax returns just before trial because he was directed to, and the investigating prosecutor's failure to recall such a direction. Similarly, in the typed version of a report that was provided to defendants, the Government failed to include a handwritten reference to Belakh's mortgage with a defendant under indictment in the Southern District of New York for mortgage fraud. And finally, at trial, the Government waited until the morning of Agent Conrad's testimony to disclose its last-minute decision to call Agents Abrahams and Bushman in his stead.

## DISCUSSION

### I. Hyde Amendment Standard

Recovery under the Hyde Amendment is intended for cases where, as Representative Hyde stated, "[U]ncle Sam sues you, charges you with a criminal violation, even gets an indictment and proceeds, but they are wrong. They are not just wrong, they are willfully wrong, they are frivolously wrong." 143 Cong. Rec. H7786-04, H7791 (Sept. 24, 1997); see also United States v. Gladstone, 141 F. Supp. 2d 438 (S.D.N.Y. 2001).

The Hyde Amendment permits an award of attorney's fees and other litigation expenses to a prevailing defendant in a federal criminal case who retained counsel, when the court finds that the position of the United States was "vexatious, frivolous, or in bad faith." 18 U.S.C. § 3006(A) (Historical and Statutory Notes). The Government's "position" means its case as a whole, so that "[e]ven if the district court determines that part of the Government's case has

merit, the movant might still be entitled to a Hyde Amendment award if the court finds that the Government's 'position' as a whole was vexatious, frivolous, or in bad faith." United States v. Heavrin, 330 F.3d 723, 730 (6th Cir. 2003). A "presumption of regularity supports . . . prosecutorial decisions and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." United States v. Armstrong, 517 U.S. 456, 464 (1996).

In determining whether a defendant has carried his or her burden of proof with respect to a Hyde Amendment claim, the Government's action must be viewed "from the perspective of the government at the time," United States v. Knott, 256 F.3d 20, 35 (1st Cir. 2001), including evidence not presented at trial, id., rather than with the power of "twenty-twenty hindsight based solely on reasonableness." United States v. Sherburne, 249 F.3d 1121, 1127 (9th Cir. 2001).

The statute does not define "vexatious, frivolous, or in bad faith," instead leaving it to the courts. The Second Circuit has not "parse[d] the precise meaning of the words," United States v. Schneider, 395 F.3d 78, 86 (2d Cir. 2005), but courts construing these terms in this context, including the Hyde Amendment decisions in this district that discuss the elements, United States v. Schneider, 289 F. Supp. 2d 328 (E.D.N.Y. 2003), aff'd, 395 F.3d 78 (2d Cir. 2005); United States v. Ali, No. 06 cr 200, 2008 WL 4773422 (E.D.N.Y. October 27, 2008), have given them their ordinary meaning. The district court in Schneider, relying on definitions arrived at by other circuit courts, defined the terms as follows: "[a] frivolous action is one that is groundless with little prospect of success; often brought to embarrass or annoy the defendant;" whereas "vexatious has both a subjective and objective element; subjectively the government must have acted maliciously or with an intent to harass the Defendant; objectively, the action must be

13

deficient or without merit;" and finally, "[b]ad faith is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity; it contemplates a state of mind affirmatively operating with furtive design or ill will." Schneider, 289 F. Supp. 2d at 331-32 (internal citations and quotation marks omitted), aff'd, 395 F.3d 78.

## II. The Mitselmakhers' Claims

Because the elements of a Hyde Amendment claim are disjunctive, the Court addresses them in turn while recognizing the overlap in factual predicates for each element and the need to view the Government's conduct as a whole.

### A. *Frivolous*

The Mitselmakhers argue that the frivolous nature of the Government's position is proven in two primary ways. First, the Government entrapped the Mitselmakhers, and because they had an affirmative defense of entrapment, the Government's prosecution had no chance of success. The defense of entrapment has two elements: "(1) government inducement of the crime, and (2) lack of predisposition on the defendant's part." United States v. Bala, 236 F.3d 87, 94 (2d Cir. 2000) (quotation omitted). If a defendant presents credible evidence of inducement, then the Government must show predisposition beyond a reasonable doubt. Id. Inducement can consist of "soliciting, proposing, initiating, broaching or suggesting the commission of the offence charged," and the circuit has held that inducement refers to "the Government's initiation of the crime and not to the degree of pressure exerted." United States v. Dunn, 779 F.2d 157, 158 (2d Cir. 1985). "A defendant is predisposed to commit a crime if he is ready and willing without persuasion to commit the crime charged and awaiting any propitious opportunity to do so."

Bala, 236 F.3d at 94 (quotation omitted). The Government may prove predisposition by, among other things, showing a defendant's previously formed design to commit the crime or his willingness to commit the crime "as evidenced by [his] ready response to the inducement." Id.

Here, even if the Mitselmakhers could show inducement by Peysakhov's actions, as discussed below, the Government had tenable arguments that the Mitselmakhers were predisposed to commit the charged crimes: (1) the Mitselmakhers had "already formed a design" to extort Peysakhov's debt, as evidenced by Peysakhov's and Belakh's testimony about the events prior to their contacting the Government, and by the initially recorded implied threats made by the Mitselmakhers; (2) the Mitselmakhers readily responded to Peysakhov's inducement by escalating to blatant threats of violence after only one week of "inducement;" and (3) the Mitselmakhers assaulted Belakh in Peysakhov's presence. See United States v. Harvey, 991 F.2d 981 (2d. Cir. 1993) (to prove predisposition it is not necessary that the past conduct be precisely the same as that being prosecuted).

Whether any of these arguments would ultimately have succeeded, or whether they in fact did, is beside the point; what matters is that they are not obviously wrong. The affirmative defense of entrapment was not so obvious here as to doom the prosecution to failure, particularly given that such a defense is a defendant's burden to prove at trial. Beyond that, the Court need not specifically consider whether the Government's conduct constituted entrapment.

Second, the Mitselmakhers contend that the Government's evidence was so lacking that its prosecution had no chance of success. The Mitselmakhers argue that the Government's case was based in large part on the Government's cooperating witnesses, Peysakhov and Belakh, who were of such dubious character that they could not be relied on. However, "[t]he government is

15

often saddled with such witness in criminal prosecutions," <u>Schneider</u>, 289 F. Supp. 2d at 331, <u>aff'd</u>, 395 F.3d 78, and relying on such witnesses, even if they are not credited by a jury, "does not render the case frivolous for purposes of the Hyde Amendment." <u>Id.</u> The Court agrees with the Government's assessment that it "did a bad job" of investigating Peysakhov's background. While the Government's investigative failings likely do not give rise to a <u>Giglio</u> violation, <u>see, e.g.</u>, <u>Afrika v. Herbert</u>, No. 02 Civ. 458, 2007 WL 2323500, at *10 (W.D.N.Y. Aug. 10, 2007), surely the Government is obligated to investigate the credibility of its witnesses more thoroughly than it did here.

The Mitselmakhers also argue that the recorded threats, which were such a significant part of the Government's proof, were made only after repeated provocation by Peysakhov, <u>i.e.</u>, they were induced. The recordings reflect the Mitselmakhers expressing frustration at Peysakhov starting "a war" with them, his "spiteful smile," and his refusal to let them settle the dispute in a "normal" way, and it was not until November 10 – a week after Peysakhov's payment was due and just over a week after the recordings had begun – that the Mitselmakhers openly threatened violence against Peysakhov. Having reviewed the tapes, it is hard to avoid the conclusion that Peysakhov went out of his way to frustrate and annoy, and probably thereby provoke, the Mitselmakhers. Perhaps because of this provocation, the jury acquitted the Mitselmakhers despite the recorded threats. But the initial recordings also contain implied threats apparently unprovoked by Peysakhov, and that material alone or in conjunction with the Mitselmakhers' threats on November 10 following Peysakhov's needling, supported the prosecution.

The Mitselmakhers also contend that the Government's theory that the beating of Belakh had extortionate intent was flawed from the beginning and disproved by the recordings. Belakh testified at trial, as he had initially told the Government, that there had been bad blood between him and Michael for some time and when he advised Peysakhov not to pay the Mitselmakhers, that inflamed the Mitselmakhers' animosity towards him. As stated above, the majority of the recordings reflect the Mitselmakhers' insistence that the beating of Belakh had nothing to do with Peysakhov's debt. Nevertheless, the Mitselmakhers appear to have beaten Belakh in part because he advised Peysakhov not to pay, and it is not unreasonable to connect that beating, delivered right before Peysakhov's eyes, to an intent to convince Peysakhov to pay.

Moreover, immediately after the first recorded conversation, on the night of November 2, Michael called Peysakhov back and told him he should ask Belakh whether Peysakhov needs to pay, because Belakh "started everything" and he "spoke to" Belakh and Belakh told him that he "told you right to your face that you are wrong, that you have to pay." Although this comment is innocuous on its face, the Government could have reasonably viewed this as Michael going out of his way to connect Belakh to the Peysakhov's debt. Again, the evidence and the reasonable interpretations of it are not as one-sided as the Mitselmakhers suggest.

In addition to pointing out the failings of the Government's direct evidence, the Mitselmakhers suggest that the Government's circumstantial evidence does not support its case. They contend that the telephone records and Belakh's medical records prove nothing beyond the fact that the Mitselmakhers assaulted him, and that Michael's alleged ties to gangsters are meaningless in the context of this case. The Mitselmakhers are correct that the telephone and medical records do not prove extortionate intent, but they do provide some corroboration for the

story reported to them by Peysakhov and Belakh. Also, the evidence of Michael's prior conviction for conspiracy to defraud the United States of fuel excise taxes, reported extortionate collection of credit, and Michael's alleged links to organized crime at least provide some support for the Government's decision to believe Peysakhov's and Belakh's allegations against the Mitselmakhers.

In sum, although the witnesses and evidence supporting the prosecution were flawed, they were not so flawed as to render the prosecution frivolous. See Ali, 2008 WL 4773422, at *14 ("Of course, 'misguided', on the one hand, and 'frivolous or vexatious', on the other, are two very different concepts."). In Schneider, the Court found that the defendant had failed to prove frivolousness because had the Government's cooperating witnesses of dubious character been believed by the jury, it would have resulted in defendant's conviction. 289 F. Supp. 2d at 332, aff'd, 395 F.3d 78. Likewise here, the jury apparently did not credit the testimony of Peysakhov or Belakh or give great weight to the other Government evidence, but had the jury credited the Government's evidence, the Mitselmakhers could have been convicted of the charges, based on the evidence available to the Government at the time.[4] The Mitselmakhers

---

[4] Extortionate collect of credit requires proof that defendant (1) collected or attempted to collect an extension of credit; (2) by extortionate means (any means which involves the use, or an express or implicit threat of use, of violence or other criminal means to cause harm to the person, reputation, or property of any person); and (3) did so knowingly.

       Extortionate collect of credit conspiracy requires proof of the substantive crime, plus proof that two or more persons entered into the unlawful agreement to accomplish the object of the charged conspiracy, and that the defendant knowingly and intentionally became a member of the conspiracy.

       Extortionate extension of credit requires proof defendant (1) knowingly made an extension of credit; (2) with an understanding between the defendant and the borrower, express or implied, tacit or otherwise, that if the borrower delayed in making his repayments or if there was a total failure to repay, violence or other criminal means would be used to force repayment; and (3) did so knowingly, willfully, and unlawfully.

have failed to prove that the Government's prosecution was frivolous within the meaning of the Hyde Amendment.

### B. Bad Faith

The Mitselmakhers' bad faith argument is not based on prosecutorial ill-will or vindictiveness, but rather it is based on the Government's deliberate or reckless disregard of the truth in pursuing the prosecution it had begun.[5]

The Mitselmakhers contend that the Government's bad faith is proven primarily by its failure to properly investigate this case, its efforts to manipulate available information, and its unwarranted efforts to detain the Mitselmakhers. They point out that the Government failed to properly investigate Peysakhov; failed to memorialize Peysakhov's statements that discredited him and undermined the Government's theory; failed to disclose civil lawsuits that go to the heart of Peysakhov's complaint; redacted a portion of an interview with Belakh that might have served to discredit him without seeking a protective order; relied on an informant's account of recorded conversations in the grand jury rather than the recordings themselves; and provided an unfairly selective view of the facts in obtaining detention. The Mitselmakhers argue that regardless of whether one or more of these failings is necessarily pernicious if considered alone, together they demonstrate that the failings were not regrettable oversights but proof of a conscious effort to avoid the truth.

However, the allegation that bad faith lay behind the Government conduct cited above is based on nothing but supposition. The Government could have and should have done more to

---

[5] They assert that good faith must be objectively reasonable, but cite no cases employing that standard in the Hyde Amendment context, and at least one federal court has specifically rejected an objective reasonableness test for good faith under the Hyde Amendment. See United States v. Manfredi, No. 06 Civ. 416, 2008 WL 686859 (E.D. Cal. Mar. 11, 2008).

investigate this case and satisfy its <u>Giglio</u> obligations, <u>United States v. Bagley</u>, 473 U.S. 667 (1985) (the duty to disclose encompasses not only exculpatory evidence, but also evidence that may be used to impeach a government witness); <u>Giglio v. United States</u>, 405 U.S. 150 (1972) (same), but the Mitselmakhers offer no evidence that the Government's failings were the product of ill-intent, as they contend, rather than simple negligence or bad judgment. Similarly, although the Mitselmakhers never specifically mentioned organized crime and did not explicitly threaten violence until provoked, the Government had bases for its contentions that the Mitselmakhers were threatening to sell the debt to organized crime and were threatening violence; the Government was under no obligation to credit the defendants' take on the evidence. Nor did the Government obviously attempt to hide the truth through its decisions to proceed as it did before the grand jury or at trial.

As additional evidence of bad faith, the Mitselmakhers point to the Government's continued prosecution despite an obvious entrapment defense, and the Government's position that an entrapment defense was not available. However, as discussed above, the entrapment defense was not so certain to succeed that continuing to prosecute in the face of it constituted bad faith. During the prosecution, the Government argued that an individual accused of a crime of violence cannot claim he was entrapped by the victim of that intended violence, and although there appears to be no authority directly in support of the position, neither is there controlling precedent directly foreclosing it and rendering it made in bad faith. The Mitselmakhers also point to the Government's continued prosecution despite a lack of evidence and credible witnesses, as proof of bad faith. However, as addressed above, these problems did not render the

20

Government's theory of the case untenable, such that its decision to proceed with the case constituted bad faith as defined under the Hyde Amendment.

### C. Vexatious

Most courts that have addressed the Hyde Amendment, including the district court in Schneider, have defined vexatious such that it essentially requires a showing of frivolousness and bad faith. See, e.g., Schneider, 289 F. Supp. 2d at 332, aff'd, 395 F.3d 78, ("'vexatious' has both a subjective and objective element; subjectively the Government must have acted maliciously or with an intent to harass the Defendant; objectively, the action must be deficient or without merit") (quotation omitted). However, the primary thrust of the term "vexatious" is the "concept of being brought for the purpose of irritating, annoying, or tormenting the opposing party." United States v. Heavrin, 330 F.3d 723, 729 (6th Cir. 2003). While the two-part standard, without further refinement, seems at odds with the principle that statutes should not be read such that they render terms redundant, the Court need not parse the meaning of the word because the Mitselmakhers' case fails under any definition of this onerous standard.

The Mitselmakhers argue that the "centerpiece" of the Government's vexatiousness was its use of Peysakhov to persist in goading the Mitselmakhers, even after Peysakhov's claims of threatened violence were disproved. Although there is no question that Peysakhov needled the Mitselmakhers throughout their recorded conversations and meetings in an effort to gather evidence against them, if the two-part definition urged by Schneider is used, the Mitselmakhers have failed to prove the Government's position was vexatious for the reasons discussed above; the Mitselmakhers have failed to prove the claim was baseless or brought with ill intent, let alone both. If the Court instead employs the "harassment/irritation" aspect of the term, the

21

Mitselmakhers' claim still fails. The Mitselmakhers have demonstrated only that they were harassed and irritated throughout the Government investigation; they do not offer proof that the Government brought the action for the purpose of harassing and irritating the Mitselmakhers.

## CONCLUSION

Because the Mitselmakhers have failed to meet their burden of proving that the Government's prosecution was vexatious, frivolous, or in bad faith, the motion is denied.

**SO ORDERED.**

s/Hon. Brian M. Cogan
_____
U.S.D.J.

Dated: Brooklyn, New York
       November 20, 2008